UNITED STATES DISTRICT COURT **RECEIVED**
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUL 16 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Curtis K. Jackson Sr.
   Plaintiff,

CIVIL RIGHTS COMPLAINT

v.

Northeastern Illinois University   )
Dave Merrill, Director of Campus Recreation   )
Martha Montes-Gaviria, Assoc. Dir. of Campus Rec. )
John Kerr, Physical Education Building Manager   )
Dan Reamer, CPRP, G.A. / Operations Campus Rec. )
Allison Kish, Building Staff   )
Jose Nungaray, Building Staff   )
Christian Roman, Building Staff   )
Anastasia Kornikov, Equipment Room Clerk   )
Randa Alshawabkeh, Front Desk Attendant   )
Pablo F. Castro, Campus Police Officer   )
Arturo Galindo, Jr., Campus Police Officer   )
Dexter G. Johnson, Campus Police Officer   )
   Defendant(s)   )

**1:18-cv-04831**
**Judge Virginia M. Kendall**
**Magistrate Judge M. David Weisman**

## I. BACKGROUND

**1.)** The plaintiff, Curtis K. Jackson Sr., is 52-year-old African-American male, who is classified as a permanently disabled adult by his Primary Care Physician, Dr. Sharon A. Irons; Psychiatrist, Dr. Nelda F. Akinbile; and the Social Security Administration.

**2.)** The plaintiff suffers from multiple mental, emotional impairments that substantially limits more than several major life activities of his, such as; working, caring for oneself (bathing and cooking), learning, reading, traveling, walking, standing, lifting, pushing, pulling, shopping, sleeping and exercising.

**3.)** The plaintiff suffers from bipolar disorder, cluster migraine headaches, chronic allergic rhinitis and sinusitis, bilateral torn ligaments and osteoarthritis in his knees, and dislocation in his left shoulder, hypertension, sleep apnea, and morbid obesity.

**4.)** These conditions are being treated under the care of the following listed individuals: Dr. Sharon A. Irons; Dr. Nelda F. Akinbile; Dr. Philip A. Omotosho; Dr. James J. Herdegen; Dr. Megan Hood; and Krzysztof D. Wlosek, NP.

**5.)** The plaintiff is classified as a student (senior) at Northeastern Illinois University (NEIU), where he is majoring in Inner City Studies and minoring in Social Justice.

**6.)** Currently, the plaintiff is classified as in "good standing" academically, carrying a cumulative 3.55 grade-point-average. The plaintiff has less the 12 hours of course study work remaining before he graduates with a Bachelors of Arts degree in Education.

**7.)** During the week of July 17-21, 2017; the plaintiff fell in the NEIU Physical Education Buildings main shower while trying to navigate through several water puddle pockets across the uneven tiled shower floor. The steam room in this facility also has an even tile floor.

**8.)** In doing so, the locker key he was holding, along with his walking cane, scratched the inner part of his left ear as he tried to brace himself before falling. His left ear began to swell and grew painful to the touch over the next few days.

**9.)** On July 23rd, 2017, the plaintiff noticed, while attempting to eat, that he could not chew food properly because the left side of his face was unable to function physically.

**10.)** He immediately sought help at the Emergency Room of Cook County Hospital where it was determined by emergency room doctors that he was suffering from Bells Palsy as a result of a developed ear infection from the fall in the above-mentioned NEIU shower room.

**11.)** The plaintiff was forced to make several emergency room visits to address other developing physical ailments connected to the fall suffered by the plaintiff above-mentioned, such as; the inability to fully close his left eye when sleeping or produce tears, and re-order needed antibiotics to address the Bells Palsy condition.

**12.)** To date, the plaintiff is still suffering the ill-effects of this condition, substantively affecting his ability to speak, and communicate with professors and classmates in the classroom to the point of suffering several embarrassing incidents with slurred, uncomprehending speaking during individual classmate participation assignments.

**13.)** After this incident, the plaintiff with requested and was granted the medical accommodation of having access to extra towels to use to walk on while accessing the NEIU Physical Education Building facility when using the steam room, shower room, and locker room.

**14.)** This reasonable accommodation provided the plaintiff extra protection against slipping and falling in these areas that don't have handrails. This accommodation has been available to the plaintiff from July 2017 to the date of this civil complaint by the defendant, NEIU facility's building manager, John Kerr., but; not without experiencing harassment, interference, intimidation, threats, coercion and retaliation via NEIU students, staff and/ or instructors.

**15.)** The plaintiff's above-entitled complaint asserts that his civil rights protected under the United States Constitution Amendments: 1st, 4th, 5th, 8th and 14th; the Americans with Disabilities Act (42 U.S.C. § 12131-12300, Title II and III); Title VI of the Civil Rights Act of 1964:Non-Discrimination in Federally-Assisted Program; 28 U.S. Code § 1343; 28 U.S. Code §

1367; 29 U.S. Code § 794; 42 U.S. Code § 1983; 42 U.S. Code § 1985; 42 U.S. Code § 1986; 42 U.S. Code §2000a-2000a-6; 42 U.S. Code § 2000b–2; 42 U.S. Code § 2000d–7, and 42 U.S. Code § 2000c–8.

## II. COMPLAINT

### CLAIMS #1

**1.)** The NEIU Physical Education Building (P.E.B.), has an A.D.A. (Americans with Disabilities Act) compliant accessible door located next to the main entrance doors of this facility on the main campus.

**2.)** This door was constructed to allow those with physical impairments accessibility to the P.E.B. without having to endure pain, discomfort and/ or restrictions from enjoying the programs, services, and activities provided by this facility that a "qualified person with disabilities" can participate in, just as, any other person who is not disabled.

**3.)** From August 2017 thru May 2018 (Fall 2017 and Spring 2018 academic semesters), the plaintiff has spoken to the defendant John Kerr P.E.B. Manager, on more than dozen occasions, about the desk staff and management not locking and turning on the A.D.A. accessible door during the weekends and weekdays he was not on duty.

**4.)** The plaintiff informed Kerr, in one-on-one conversations, about these disabling conditions: physical, mental and emotional as stated above in the 'Background' section of this civil complaint in paragraphs #2 and #3 during the week of July 25 -27, several times in the morning between 7:00 am and 8:00 am in the P.E.B. locker desk area.

**5.)** The plaintiff particularly, emphasized the condition of his left shoulder and knees and that having to push the regular P.E.B. entrance doors and the A.D.A. door, When it's not unlocked and turned on) is not only painful to do, but, puts me at risk of further injury because of the instability of these above-described body parts.

**6.)** Kerr routinely responded: "I have talked to the students and staff about it, and I will do so again". Kerr said this to the plaintiff after each of numerous requests for his intervention from July 2017 to the date of the filing of this civil rights complaint, particularly, when the defendants Allison Kish, Anastasia Kornikov, Randa Alshawabkeh, began to verbally threaten and deny the plaintiff the accommodations Kerr established.

**7.)** During the spring semester (January 2018 – to the date of the filing of this civil rights complaint), defendants Kornikov and Alshawabkeh moved from threatening the loss of the accommodation established by Kerr, to outright denying his access to the extra towel service during the weekends and week days Kerr was not on duty. This was occurring regardless of the several instances he stated to them, in the plaintiff's presence during weekday operations: "We are accommodating Mr. Jackson with the extra towels, because he needs them for stability while walking across the floor in the shower room and steam room so he doesn't slip and fall."

**8.)** Also, during the spring semester (January 2018 –March 2018), defendants, Allison Kish, Jose Nungaray, Christian Roman, all student managers with more leadership status over defendants Kornikov and Alshawabkeh, started to greeted the plaintiff cynically when he came to the P.E.B., by jointly and separately making comments about a new rule being instituted that limited visitors of the P.E.B. to only two towels per visit in the men's locker room.

**9.)** The plaintiff several times, explained to Kish, Nungaray and Roman individually and jointly, on several different occasions during the weekends (January 2018 –March 2018) that he has was granted the accommodation for extra towel service by Kerr, which allowed him access to the towels (2-extral large towels, 2- regular size bath towels and 2- Hand towels) he needed to be safe using the steam room and shower area without slipping and falling due to his physical disabilities.

**10.)** The plaintiff also informed Kish, Nungaray and Roman individually and jointly, on these several different occasions (stated above paragraph #9) during the weekends (January 2018 – March 2018) that they also could either email or call Kerr to verify these asserted accommodations. None of them would try to contact Kerr, and continued disregard the established accommodation, by basically ignoring the plaintiff and denying the access to extra towel service.

**11.)** At no time during the fall semester or the spring semester of 2017-18, was there ever a published or posted rule change visible in the P.E.B. or on the NEIU school website for the 'Health Sciences and Physical Education' or 'Campus Recreation' sites, that supported the claims of Kish, Nungaray and Roman. Nor have there been any such publications on display in the P.E.B. facility form July 2017 to the date of the filing of this civil rights complaint.

**12.)** The plaintiff has preserved cell phone video dated for March 2018, during a weekend between March 17-25, 2018, of the plaintiff Roman walking toward the P.E.B. A.D.A. door and attempting remove black 'retractable belt partition pole' and use a key to unlock it, once he noticed I was cellphone video recording the situation.

**13.)** Within this cell phone video, you can see a Mexican gentlemen (who did not work for the school nor was he a student), inside of the P.E.B. standing on the other side of this A.D.A. door behind a 3 to 3.5 foot tall, black retractable belt partition poles, waving for the plaintiff over to use the regular P.E.B. entrance door when the plaintiff was punching the access button to trigger the A.D.A. door to automatically open. This Mexican gentleman was with a youth soccer team, and was assigned by the P.E.B. desk staff to stop anybody from using the A.D.A. door.

**14.)** After the plaintiff struggled with entering these doors, still recording with his cell phone, you see defendant Christian Roman, designated as the lead student manager in charge of building keys, realizing that this situation was being recorded and trying to explain why the door was not working, to create a self-serving aesthetic as plausible excuse, as he made his way over to the door to remove the retractable belt partition poles, unlock the door and click the button 'on' to allow the door to function properly as it was intended to for.

4

**15.)** On this day, like many other weekends from July 2017 to the date of the filing of this civil rights lawsuit, in order for the plaintiff to use the P.E.B. facilities, the plaintiff had to endure physical pain and suffering, while threatening the future health of his left shoulder and knees in order to access shower and steam room areas, by entering through heavy P.E.B. regular entrance doors and not be able to use the shower or steam rooms because my accommodation granted by Kerr was being denied by defendants Kish, Nungaray, Roman, Kornikov and Alshawabkeh (all considered programs, services and activities under the A.D.A. Act Provisions II and III.).

**16.)** For the plaintiff, this meant only being able to use the locker room sinks for proverbial 'bird baths'.

**17.)** Defendants Kish, Nungaray, Roman, Kornikov, and Alshawabkeh, actions amounted to ongoing unified effort to not only deny the plaintiff the accommodations outlined above by Kerr, but, also commence in acts of humiliation, intimidation, embarrassment, retaliation, in order to interfere the plaintiff's rights to access, enjoy and benefit from the accommodation granted by defendant Kerr, as well as; punish him for reporting their actions to Kerr in the form of a complaint that violates plaintiffs rights protected by the A.D.A. Act (Title II & III) and his protected civil right to freedom of speech and petition the government for a redress of grievances.

**18.)** Despite the intent to provide the reasonable accommodation by the plaintiff, defendant Kerr failed at protecting the plaintiff from the denial of meaningful access to programs, services and activities (shower area and steam room) without enduring pain, discomfort, as well as; the increased threats via abusive verbal acts of defendants Kish, Nungaray, Roman, Kornikov, and Alshawabkeh.

**19.)** From July 2017 to the date of the filing of this civil rights complaint, Kerr has never shown or stated to the plaintiff that he officially reprimanded or reported the plaintiffs concerns and allegations regarding Kish, Nungaray, Roman, Kornikov, and Alshawabkeh to any university entity, such as, the Dean of Students Office.

**20.)** His refusal to act to protect the plaintiff amounted to providing cover for the conspiracy to continue, because his omissions allowed the actions of these defendants to stand. These actions and omissions, in totality, also amount to 'cruel and unusual punishment', violating the plaintiffs rights protected under U.S. Constitution's 1st, 4th, 8th, and 14th, Amendment, as well as; the Americans with Disabilities Act (42 U.S.C. § 12131-12300, Title II and III); Title VI of the Civil Rights Act of 1964:Non-Discrimination in Federally-Assisted Programs.

**21.)** Thus, separately and jointly, conspired to violate the plaintiffs civil rights protected under the United States Constitution Amendments: 1st, 4th, 5th, 8th and 14th; the Americans with Disabilities Act (42 U.S.C. § 12131-12300, Title II and III); Title VI of the Civil Rights Act of 1964:Non-Discrimination in Federally-Assisted Program; 28 U.S. Code § 1343; 28 U.S. Code § 1367; 29 U.S. Code § 794; 42 U.S. Code § 1983; 42 U.S. Code § 1985; 42 U.S. Code § 1986; 42 U.S. Code §2000a-2000a-6; 42 U.S. Code § 2000b–2; 42 U.S. Code § 2000d–7; and 42 U.S. Code § 2000c–8.

**CLAIMS #2**

**22.)** On Saturday, March 10th, 2018, the plaintiff entered PEB at approx. 7:45 am along with the three other women who were going to a class taught by the defendant, Martha Montes-Gaviria, (Assoc. Dir. of Campus Recreation).

**23.)** Defendant Montes-Gaviria escorted the plaintiff to the men's locker room desk, once there, he handed his NEIU I.D. to her and requested his needed towels and locker key #649. She then began to hand the plaintiff the towels requested, but; she didn't have the keys to the desk drawer that contained the locker keys.

**24.)** The plaintiff stated he could wait until the assigned desk clerk arrived to get his locker key and towels at the same time. She handed the plaintiff back his NEIU I.D., and they walked back to the waiting lobby located in the entrance area of the P.E.B.

**25.)** While waiting for the locker room desk clerk to show up, the plaintiff noticed dozens of groups anywhere between 5 to 15 or more people, none of them NEIU students, entering the P.E.B., without checking in at the entrance desk or presenting identification, to participate in a basketball tournament being held in the P.E.B. gymnasium. At approx. 8:00 am, there were no student desk clerks or campus police monitoring the entrance, until approx. 8:45 am.

**26.)** At about 8:20 am, the plaintiff notice defendant Nungaray was walking through the building unlocking doors on both the first and second floor of the P.E.B. The plaintiff asked defendant Nungaray if he knew when someone would be available to open up the locker room desk to hand out towels and locker keys. Nungaray stated: "Someone will be back there by 8:30 A.M."

**27.)** The plaintiff sat in the waiting area, as other people, not students, continued to enter the building with no student desk clerks or campus police security present to monitor the building.

**28.)** At approx. 8:45 A.M., the plaintiff asked defendant Nungaray, who was walking toward the entrance door, if there was anyone heading toward the locker room to open it up. Nungaray, while walking to the entrance to the desk clerk and offices responded by half yelling and laughing simultaneously: "Why you don't stop fucking with me, I told you the building opens at 9:00 A.M."

**29.)** The plaintiff admits, he got up and walked to the front desk to address Nungaray rude response stated: "Young man, I am a student, just like you, but; I'm old enough to be your father... show a little respect when you speak to me." Nungaray responded giggled and walked away from the plaintiff towards the defendant Alshawabkeh, who was looking downward and giggling as she sat behind the P.E.B. entrance front desk behind a computer monitor facing the entrance door and A.D.A. access door.

**30.)** At approx. 9:00 A.M., the plaintiff walked to the men's locker room where he saw defendant Kornikov sitting at the front desk folding towels while talking to defendant Kish. Once they saw the plaintiff, they looked at each other and began to laugh.

**31.)** The plaintiff handed his NEIU I.D. to Kornikov and stated he needed two big towels, two regular sized bath towels and a face cloth. Kish interjected and stated: "You know, we don't have to accommodate you, and Kerr is not here to give you're affirmative action."

**32.)** The plaintiff responded: "This is not about race, this is about a reasonable accommodation request granted by your supervisor, as you already are aware of."

**33.)** Kish stated: "Why should we help you, when all you do is complain to him about that damn handicap door not being open on the weekends when we're here." The plaintiff responded: "Young lady, you tell me something... why doesn't you all working the desks on the weekends want the A.D.A. access door functioning when you're here?"

**34.)** Kish handed the plaintiff one bath towel and one hand towel, and then stated: "Don't slip and fall now, because nobody coming in there to help you." The plaintiff responded: "I don't get you guys, what is this about..." Kornikov cut the plaintiff off from speaking and stated: "How about you go back to the south side, since you don't like it up here, on the main campus." Kish added, as the plaintiff headed to the men's locker room: "Yeah, sir... maybe you should go workout with your homeboys on the south side."

**35.)** Later, at approx. 10:40 am – 11:15 am, defendants, NEIU campus policemen Pablo F. Castro and Arturo Galindo Jr., approached the plaintiff while he stood naked in the shower area wetting a towel to take back to his place at the face bowl he was using to take a "bird bath' after being denied the needed for him to, safely, navigate the shower and steam rooms.

**36.)** Castro stated: "Hey buddy, we want to speak to you?" The plaintiff asked: "Sure, is there a problem, and can I dry off and get dress first?" Galindo Jr. stated: "No, we just want to make sure you understand a few things, and we'll wait for you at your locker, what number is it?"

**37.)** The plaintiff stated: "Its 649, but, this can't wait until I get dressed and come out to the waiting area of the building. Castro sternly stated: "You need to hurry up and get out here." Castro and Galindo Jr. left, and waited at the plaintiff's locker.

**38.)** After drying off, the plaintiff grabbed his walking cane, towels, and locker key and headed to his locker, #649. The locker room is now full of kids and parents getting dress to play in the basketball event held in the P.E.B. gym. Castro and Galindo Jr. are standing at the plaintiff's assigned locker. The plaintiff excuses himself so he can open his locker. And, as soon as the locker is open, Castro orders the plaintiff to sit down and nudges him to the side with the outside of his left hand.

**39.)** As Castro began searching through the plaintiff's locker, Galindo Jr. tried to take the plaintiff's attention away from what Castro was doing, and on him by asking: "So, you know why we're here?"

**40.)** The plaintiff looks back, and notices Castro pulling out his backpack and begins to unzip it open it up. The plaintiff quickly asks: "Sir, you all have not told me why you are stopping, and there is nothing in plain view in my backpack that is unlawful to have, and you need cause or a

7

warrant to search my property, don't you?"

**41.)** Castro starting removing all of the contents of the plaintiff's backpack, and placing them on the bench by my locker as numerous people watched from nearby lockers. The plaintiff immediately asked: "Excuse me, but, you want to tell me why you're stopping me?" Castro stated: "What, you some kind of street lawyer?" The plaintiff responded, "No, but, I am an NEIU student."

**42.)** Castro pulled out medicine bottles from the plaintiff's backpack that were rightfully owned by the plaintiff and prescribed by Dr. Nelda F. Akinbile, his psychiatrist. Castro held up a medicine bottle, and stated loudly, "I got lithium over here!" Galindo Jr. started laughing and looking at other people behind him looking on at what Castro was doing.

**43.)** Galindo Jr. smirked: "That's all we need on this campus is some crazy 'brotha' roaming our campus up here on the north side." Laughter could be heard continuously heard from the plaintiff's locker row (2nd) area, as well as; the other 1st and 3rd locker row areas. The plaintiff was humiliated and embarrassed.

**44.)** Galindo Jr., asked: "Well if you're a student, how come you don't know the building rules?" The plaintiff responded: "Mrs. Montes-Gaviria let me in the building, along with several other people before eight o'clock. So, can I get dressed, since I have not done anything wrong?"

**45.)** The plaintiff had nothing but a (P.E.B. issued) light blue hand towel (approx. 15 inches in width and 18 inches in length) covering his genitals area, as Castro and Galindo Jr. continued to search through the plaintiff's backpack, wallet and computer.

**46.)** Galindo Jr. asked: "What's the password your cell phone?" The plaintiff stated: "I'm familiar with my rights, and at this time, I cannot give that to you." Castro got up close into the plaintiff's face, and asked: "You can't, or you won't?" The plaintiff responded: "I can't."

**47.)** Finally, after about twenty minutes, Castro and Galindo Jr. moved from in front of the plaintiff's locker. Galindo stated: "Maybe you should get to know the rules around here and stop complaining about a damn cripple door". He then handed the plaintiff a copy of the P.E.B. operations hours.

**48.)** The plaintiff asked: "I just want to know what I did wrong? Why are you guys treating me like this, your humiliating and embarrassing me in front of these visiting guests? I'm a registered student here, not a visitor?"

**49.)** Castro answered: "You don't get it, do you? Stop complaining about that damn cripple door, can you do that?"

**50.)** Defendant Castro threw a copy of the P.E.B. operations hours in the plaintiff's backpack and he and Galindo Jr. started walking toward the locker room exit. Bur, before Galindo Jr. exited, he stated: "After we run your name, we'll see if we can get the cause." Castro followed: "Curtis

Jackson right?" The plaintiff did not respond, he was just sat silently in front of his locker, humiliated, embarrassed and shocked by what just took place.

**51.)** After getting dressed, repacking his backpack, the plaintiff exited the locker room, dropped off his towels in the towel basket and then returned his locker key to get back his NEIU I.D. from the locker room desk, defendant Kornikov, who was seated behind the desk. Kish was standing at the desk giggling.

**52.)** Kish smirked: "That's what happens when you mess with us, and my people." She then gave the smiling defendant Kornikov a high-five slap, then added: "Maybe you should go back to 39th Street and exercise over there. All, that's right, you people don't have a gym on the hood campus, huh?"

**53.)** The plaintiff didn't respond to Kish, collected his school I.D., picked up his backpack and walking cane, and headed to the P.E.B. A.D.A. access door to exit the facility. It was not turned on and a black retractable headed to the campus library. And, as the plaintiff painfully struggled to push open the non-working A.D.A. access door, Alshawabkeh sarcastically said: "Tell the 'brothas' on the south side we said welcome."

**54.)** The above comments made by defendant Kish, Nungaray, Kornikov, Castro, and Galindo Jr. were intentionally racially charged to slight the plaintiff, as well as; and the NEIU's Jacob H. Carruthers Center for Inner City Studies Center. This is located on Chicago's South Side in the predominately African-American neighborhood of Bronzeville.

**55.)** Defendants Kish, Nungaray, Kornikov, Alshawabkeh, Castro and Galindo Jr.; acted separately and jointly, in a conspiracy manner of misconduct described in the above paragraphs of this above-entitled civil rights complaint Claims #2 section.

**56.)** Defendants, Kish, Kornikov, Nungaray, Alshawabkeh, Castro and Galindo Jr. conspired to act with deliberate indifference with acts of interference, coercion, threats, harassment, humiliation and retaliation against the plaintiff for requesting accommodations and verbally grieving the intentional denial and interference of the plaintiff violated civil rights to access the A.D.A. door in P.E.B.

**57.)** Kish, Kornikov, Nungaray, Alshawabkeh, Castro and Galindo Jr. violated the plaintiffs civil rights protected under the United States Constitution Amendments: 1st, 4th, 5th, 8th and 14th; the Americans with Disabilities Act (42 U.S.C. § 12131-12300, Title II and III); Title VI of the Civil Rights Act of 1964:Non-Discrimination in Federally-Assisted Program; 28 U.S. Code § 1343; 28 U.S. Code § 1367; 29 U.S. Code § 794; 42 U.S. Code § 1983; 42 U.S. Code § 1985; 42 U.S. Code § 1986; 42 U.S. Code §2000a-2000a-6; 42 U.S. Code § 2000b–2; 42 U.S. Code § 2000d–7; and 42 U.S. Code § 2000c–8.

**58.)** Castro and Galindo Jr. above-asserted separate and joint efforts to conspire and deny the plaintiff his right to be free from "unreasonable searches and seizures", freedom from "cruel and unusual punishment", freedom to speech and redress of grievances, as well as; denial of

"procedure due process" simultaneously, which are all protected civil rights under the United States Constitution's 1st, 4th, 8th, 14th Amendments.

**59.)** In 1985, the U.S. Supreme Court determined that the Fourth Amendment applies to students in the public schools (New Jersey v. T.L.O., 1985). The Supreme Court articulated a standard for student searches: reasonable suspicion. Reasonable suspicion is satisfied when two conditions exist: (1) the search is justified at its inception, meaning that there are reasonable grounds for suspecting that the search will reveal evidence that the student has violated or is violating the law or school rules, and (2) the search is reasonably related in scope to the circumstances that justified the search, meaning that the measures used to conduct the search are reasonably related to the objectives of the search and that the search is not excessively intrusive in light of the student's age and sex and the nature of the offense. Therefore, Castro and Galindo Jr., acts in commencing in a search of the plaintiff's backpack, and locker, failed to meet the above-stated standards for reasonable suspicion.

**60.)** Also, Castro and Galindo Jr. actions also violated the plaintiff's civil rights to freedom of speech, to petition the government for a redress of grievances. Their actions were birthed from submission of a false report by defendants Kish, Nungaray and Montes-Gaviria, which was the only reason created that led to the encounter between the plaintiff and officers. There acts and omissions are actionable, particularly, when it was clear that the plaintiff had not broken any school rules or laws, given it was the defendant, Montes-Gaviria, who allowed and escorted the plaintiff into the P.E.B. facility at approx. 7:45 am Saturday, March 10th, 2018. These conspired acts in combination violated the plaintiffs civil rights protected under the United States Constitution Amendments: 1st, 4th, 5th, 8th and 14th; the Americans with Disabilities Act (42 U.S.C. § 12131-12300, Title II and III); Title VI of the Civil Rights Act of 1964:Non-Discrimination in Federally-Assisted Program; 28 U.S. Code § 1343; 28 U.S. Code § 1367; 29 U.S. Code § 794; 42 U.S. Code § 1983; 42 U.S. Code § 1985; 42 U.S. Code § 1986; 42 U.S. Code §2000a-2000a-6; 42 U.S. Code § 2000b–2; 42 U.S. Code § 2000d–7; and 42 U.S. Code § 2000c–8.T

**CLAIMS #3**

**61.)** On Saturday, June 9th, 2018, the plaintiff stood approached the P.E.B. at approx. 7:45 A.M, where three to four other women were waiting or the building to be open.

**62.)** Shortly after, Defendant Montes-Gaviria emerged through the regular doors along with defendant NEIU Campus Police Officer Dexter Johnson, who opened the facility for her through the South entrance that faces the P.E.B. Parking lot.

**63.)** Defendant Montes-Gaviria allowed the three women inside, but, told the plaintiff the facility would not be open until 9:00 A.M. She also handed him a copy of the P.E.B. Operations Hours for the summer 2018 semester. The plaintiff asked if there was a class going on that morning, and Montes-Gaviria responded with a smile: "Yes, there is my 8:00 A.M. class, so you should come back at nine."

**64.)** The plaintiff left and went to the Computer Lab for a while until returning later to the P.E.B. at 9:00 A.M. However, while in the computer lab, the plaintiff noticed on the document that defendant Montes-Gaviria handed to him that the P.E.B. was not open for any services or classes that morning.

**65.)** The plaintiff logged in to the computer, and research class schedules for physical education and health on the main campus for Saturday's and there was on listed. In fact, the document defendant Montes-Gaviria handed to the plaintiff stated that the facility was closed on Saturday and Sunday from May 28th thru August 24th, 2018.

**66.)** The plaintiff arrived at the P.E.B. at approx. 8:55 A.M. where he was met by another older white woman, waiting for the facility to open so she could go swimming. However, after about 15 minutes elapsed, she decided to call the NEIU Campus Police to find out why the building was not open.

**67.)** Shortly after, defendant Johnson showed up, and he opened the facility, to which all the first-floor lights were off, and he stated: "Please, take a seat, I'm going to find out what was going on". He headed up to the second floor to find defendant Montes-Gaviria.

**68.)** About ten minutes later, defendant Johnson returned downstairs to the first floor looking a bit upset. Johnson stated: "I'm sorry, but, the building is closed." The plaintiff and the other women left the facility with Johnson following us to secure the doors.

**69.)** It should be noted on March 10th, 2018, it was defendant Montes-Gaviria who allowed me to enter the P.E.B. at approx. 7:45 A.M. with several of the same women who were allowed to enter the P.E.B. facility on June 9th, 2018 at approx. 7:45 A.M.

**70.)** Per the NEIU Student Portal, Advanced Search for class schedules of spring 2018 semester, there were no classes for Exercise Science, Health Education, Physical Education Activity, or Physical Education Theory offered on that morning either.

**71.)** The women, above-mentioned, were the witnessed by the plaintiff allowed to enter the P.E.B. facility without proper student or guest identification by Montes-Gaviria, told the plaintiff while they were waiting for the building to open that they were not enrolled students March 10th, 2018 and June 9th, 2018.

**72.)** On Friday, June 15th, 2018 at approx. 8:01 A.M., the defendant Montes-Gaviria met the plaintiff at the P.E.B. A.D.A. door (that was not turned on or unlocked for normal usage), and propped it open for him to enter. It was not turned on or unlocked for normal usage.

**73.)** She was overly nice and polite, for obvious reasons, she knew that she had lied to the plaintiff several times on June 9th, 2018 about the P.E.B. operations hours, and her scheduled class that morning did not exist, according to the online NEIU website under "Class Schedule".

**74.)** After Montes-Gaviria escorted the plaintiff to the locker room, she then went behind the counter and asked the plaintiff: "Remind me, why Kerr allows you to have extra towels, again?"

11

**75.)** The plaintiff began to explain his above-mentioned physical impairments, but, Montes-Gaviria rudely cut him off before he could truly get started, and said: "Look, I give you what you need, but, I don't need no problems with how I hustle, know what I mean?" The plaintiff did not respond, he and Montes-Gaviria just starred at one another, for a moment.

**76.)** After about fifteen to twenty seconds, the plaintiff stated: "Look, I'm just trying to get healthy, and I'm trying to do that without hurting myself in the process…"

**77.)** Montes-Gaviria quickly stopped the plaintiff again by raving her right hand index finger while shaking her head from side-to-side, then stated: "You're smart, you know what I'm saying to you. Stop complaining about the damn handicap door not being open, nobody got time for that shit, don't fuck with my hustle, and then, maybe you can get the so-called accommodations you need with no problems, alright?"

**78.)** The plaintiff didn't respond verbally, he just shook his head in disbelief. Montes-Gaviria gave the plaintiff his towels, his locker key, and added: "This way, you won't have to deal with campus police, know what I mean 'brotha'. You needed to be sent a message, that's why I told Jose (Nungaray) and Allison (Kish) to call the police" The plaintiff was shocked, and just walked toward the locker room. Also, when the plaintiff left the P.E.B. facility, the A.D.A. access door was not turned on to function; P.E.B. facility video will confirm this.

**79.)** On June 20th or 21st, 2018; at approx. 9:24 A.M. the plaintiff was walking within the crosswalk located about 100 feet away from the southwest corner of P.E.B. facility and connects the campus to the P.E.B.'s south parking lot and athletic field. This date can be verified via I.D. check-in records for the P.E.B.

**80.)** Seconds later, defendant Dave Merrill, Director of Campus Recreation, driving a silver-colored four-door sedan with black tire rims, wearing a blue shirt and white or tan pants, sped through "stop" sign without stopping, and turned eastward through the crosswalk of the P.E.B. south parking lot entrance with only a few feet to spare, in front of the plaintiff. He then parked in the first parking spot closet to the P.E.B. south parking lot entrance located on the south end of the parking lot. P.E.B. facility video can verify the exact day and time Merrill entered the building.

**81.)** The plaintiff walked towards defendant Merrill's car and asked him as he got out of his car smiling a question: "You know, you just rolled through that stop sign without stopping, and swerved your car a few feet in front of me while I'm walking through the crosswalk. What was that about?" Merrill responded sarcastically saying: "It's a message to you, smart guy. Stop with screwing with staff people and crying to Kerr about the handicap door not being turned by the staff. You don't run shit around here, all this disability accommodation bullshit needs to stop. Have a nice day." P.E.B. facility video can verify the exact day and time Merrill entered the building.

**82.)** The plaintiff admits, he was not happy, and angrily responded: "Message received, you all want war, you got it."

**83.)** On Friday, June 29th, 2018, at approx. 7:30am -7:45am, defendant Dan Reamer substituted

for defendant Kerr as the acting building manager. He opened the A.D.A. door and greeted the plaintiff sarcastically, "So, you're the gentlemen who wants all of our heads for this door not being turned on?" The plaintiff responded, "I truly need meaningful access to that door, that's all."

**84.)** As Reamer and the plaintiff walked towards the locker room desk, Reamer stated: "I don't like it either… when you mess with my guys here?" The plaintiff asked: "I don't know what you're talking about, my issues and concerns is about having meaningful access to the programs and facilities of P.E.B. without hurting myself in the process, that's all."

**85.)** Reamer gave the plaintiff just one light blue hand towel and one bath towel, despite the plaintiff getting what he requested: two big towels, two regular bath towels and two hand towels per the agreement with Kerr granting the accommodation of extra towel access with the plaintiff. Reamer stated: "Today, you get what I give you, now what?" The plaintiff just took the towels and locker key and headed to the locker room.

**86.)** Since July 2017, the plaintiff has had to endure a "hostile environment" from the P.E.B. student workers and NEIU staff, that includes falsely filed police reports by Montes-Gaviria Kish, and Nungaray; continuous exposure to conspiring acts of interference, coercion, threats, harassment, humiliation and retaliation targeted towards the plaintiff for requesting accommodations and verbally grieving the lack of meaningful access to the A.D.A. door within the P.E.B. by Montes-Gaviria, Kish, Nungaray, Roman, Kornikov, Alshawabkeh, Merrill, Montes-Gaviria, Kerr, Reamer, Castro, Galindo, Jr., and Johnson.

**87.)** Kerr and Johnson, while it may be arguable that they were less culpable in the measure intent and hurtfulness, it is their decision to omission from their duty to protect the student from harm, is what makes them a part of the above-mention actions.

**88.)** Kerr had direct knowledge of the plaintiff's allegations on numerous occasions during July 2017 to the date of the filing of this civil complaint.

**89.)** Defendant Johnson, had direct knowledge of Montes-Gaviria intentionally, falsifying P.E.B. operation hours to the plaintiff, with the intent harass the plaintiff. Johnson also learned firsthand from Montes-Gaviria that she not only lied to the plaintiff and another female visitor seeking access to P.E.B. facility on the morning Saturday, June 9th, 2018 but, that she lied and had him open the facilities for her personal gain to train three women that day for self-serving purposes masked as a schedule class. Johnson should have reported these actions, instead he chose to provide Montes-Gaviria for her actions.

**90.)** The plaintiff's quality of participation in the programs, services and activities in the form of access to the locker room, shower area and steam room have been stripped of the right to enjoy them because of the conspiratorial acts of the above-mentioned defendants. The also suffered emotional stress, mental anguish, and physical pain.

**91.)** The plaintiff has suffered cruel and unusual punishment from exposure to the wanton treatment from the defendants, Merrill, Martha Montes-Gaviria, Kish, Nungaray, Roman,

Kornikov, Alshawabkeh, Reamer, Castro and Galindo Jr. Whereas, in the case of Kerr, he failed to protect the plaintiff, a member of a protected class per the Americans with Disabilities Act (Title II and III) and as a student of the university Title VI of the Civil Rights Act of 1964: Non-Discrimination in Federally-Assisted Program.

**92.)** Defendants Merrill, Martha Montes-Gaviria, Kerr, Kish, Nungaray, Roman, Kornikov, and Alshawabkeh, Reamer, Castro and Galindo Jr. actions also violated the plaintiff's rights to be free from conspiracy to interfere with his civil rights, causing the plaintiff to suffer emotional distress and mental anguish, and physical pain as he had to endure these actions in an escalating "hostile environment" from July, 2017 to the date of the filing of this civil rights complaint.

**93.)** The plaintiff has preserved protection from these kinds of actions under 42 U.S. Code § 1985, which states: "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws that protect the civil rights of the plaintiff." Therefore the plaintiff seeks relief as provided under the following statutes; the United States Constitution Amendments: 1st, 4th, 5th, 8th and 14th; the Americans with Disabilities Act (42 U.S.C. § 12131-12300, Title II and III); Title VI of the Civil Rights Act of 1964: Non-Discrimination in Federally-Assisted Program; 28 U.S. Code § 1343; 28 U.S. Code § 1367; 29 U.S. Code § 794; 42 U.S. Code § 1983; Code § 1986; 42 U.S. Code §2000a-2000a-6; 42 U.S. Code § 2000b–2; 42 U.S. Code § 2000d–& 7; and 42 U.S. Code § 2000c–8.

## CLAIMS #4

**94.)** The defendants, Merrill, Martha Montes-Gaviria, Kerr, Kish, Nungaray, Roman, Kornikov, Alshawabkeh, Castro, and Galindo Jr. actions as described under the above-mentioned claims, also showed deliberate indifference and conspiracy to interfere with his civil rights, causing the plaintiff to suffer emotional distress and mental anguish as he had to endure these actions in a "hostile environment" since July, 2017. But, those actions were deliberately indifferent to the plaintiff's current and future health.

**95.)** The plaintiff suffers from several conditions that have been directly and indirectly at risk: bipolar disorder, bilateral torn ligaments and osteoarthritis in his knees, and dislocation in his left shoulder, hypertension, and morbid obesity. The above-stated actions put the plaintiff's current and future health at risk. Defendants, Merrill, Martha Montes-Gaviria, Kerr, Kish, Nungaray, Roman, Kornikov and Alshawabkeh, Castro and Galindo Jr., separate and collective actions are in violation of the plaintiff's protected rights to be free from "cruel and unusual punishment" under the United States Constitution's 8th Amendment, as well as; relief allowed under the following statutes: 1st, 4th, and 14th; the Americans with Disabilities Act (42 U.S.C. § 12131-12300, Title II and III); Title VI of the Civil Rights Act of 1964: Non-Discrimination in Federally-Assisted Program; 28 U.S. Code § 1343; 28 U.S. Code § 1367; 29 U.S. Code § 794; 42 U.S. Code § 1983; Code § 1986; 42 U.S. Code §2000a-2000a-6; 42 U.S. Code § 2000b–2; 42 U.S. Code § 2000d–& 7; and 42 U.S. Code § 2000c–8.

## CLAIMS #5

**96.)** The defendants, Martha Montes-Gaviria, Kish, Kornikov, Alshawabkeh, Castro, and Galindo Jr. to racist and prejudicial ominous acts and language used individually and jointly to conspire in intimidating, threatening, interfering, coercing, and retaliating against the plaintiff for requesting a reasonable accommodation to extra access service to towels participate in the program or activities of the steam and shower rooms within the P.E.B.

**97.)** In addition because of the plaintiff's report and /or complaints about the lack of meaningful and interference to access of the full usage of the A.D.A. access door violated his civil rights and caused the plaintiff to suffer emotional distress and mental anguish as he had to endure these actions in a "hostile environment" form July, 2017 to the date of the filing of this civil rights complaint.

**98.)** The plaintiff seeks all relief allowed under the following statues the United States Constitution Amendments: 1st, 4th, 5th, 8th and 14th; the Americans with Disabilities Act (42 U.S.C. § 12131-12300, Title II and III); Title VI of the Civil Rights Act of 1964: Non-Discrimination in Federally-Assisted Program; 28 U.S. Code § 1343; 28 U.S. Code § 1367; 29 U.S. Code § 794; 42 U.S. Code § 1983; 42 U.S. Code § 1985; 42 U.S. Code § 1986; 42 U.S. Code §2000a-2000a-6; 42 U.S. Code § 2000b–2; 42 U.S. Code § 2000d–& 7; and 42 U.S. Code § 2000c–8.

## III. JURISDICTION

I am requesting that this Court asserts jurisdiction under the following laws: the United States Constitution Amendments: 1st, 4th, 5th, 8th and 14th; the Americans with Disabilities Act (42 U.S.C. § 12131-12300, Title II and III); Title VI of the Civil Rights Act of 1964: Non-Discrimination in Federally-Assisted Program; 28 U.S. Code § 1343; 28 U.S. Code § 1367; 29 U.S. Code § 794; 42 U.S. Code § 1983; 42 U.S. Code § 1985; 42 U.S. Code § 1986; 42 U.S. Code §2000a-2000a-6; 42 U.S. Code § 2000b–2; 42 U.S. Code § 2000d–& 7; and 42 U.S. Code § 2000c–8.

## IV. RELIEF

**1.)** I am seeking relief for all defendants individually and jointly under their official capacities and personal capacities in the amount of $100,000.00 in damages for each defendant in compensatory damages;

**2.)** I am seeking relief for all defendants individually and jointly under their official capacities and personal capacities in the amount of $100,000.00 in damages from each defendant in punitive damages;

**3.)** I am also seeking Injunctive Relief in the formation, development, and implementation of a meaningful Student Complaint Program that separately addresses complaints by students that are

"qualified persons with disabilities" as provided by the American with Disabilities Act I, II, III that includes provision of remedies for financial relief. This program shall be operated independently by individuals and/ or organization reps that are not causally connected or affiliated with current or past employees, staff, administration, students of the Northeastern Illinois University.

**4.)** I am also seeking the Injunctive Relief in the formation, development, and implementation of a meaningful Student Complaint Program that separately address complaints made by students regarding discrimination based on race, color, and national origin in programs and activities receiving federal financial assistance as provided under Title VI of the Civil Rights Act of 1964: Non-Discrimination in Federally-Assisted Program. This program shall be operated independently by professionally trained individuals that shall not be causally connected or affiliated with current or past employees, staff, administration, students of the Northeastern Illinois University.

**5.)** I am also seeking the Injunctive Relief in the formation, development, and implementation of a meaningful Student Complaint Program that separately address complaints made by students regarding ethical misconduct by Northeastern Illinois University employees, instructors, professors, staff and administrators. This program shall be operated independently by professionally trained individuals that shall not be causally connected or affiliated with current or past employees, staff, administration, students of the Northeastern Illinois University.

**6.)** I am also seeking the Injunctive Relief in the formation, development, and implementation of a meaningful Student Complaint Program that separately address complaints made by students regarding unethical conduct and discriminatory acts. As well as, disability awareness training to address encounters with students of has physical, mental or emotional disabilities by Northeastern Illinois University campus police officers. This program shall be operated independently by professionally trained individuals that shall not be causally connected or affiliated with current or past employees, staff, administration, students of the Northeastern Illinois University.

## V. <u>TRIAL BY JURY</u>

The plaintiff in the above-entitled civil rights complaint formally requests that this Court accepts his request for **"TRIAL BY JURY"**.

## VI. **CERTIFICATION**

By signing this complaint, I certify that the facts stated in this complaint are true and correct to the best of my knowledge, information and belief. I understand that if this certification is not correct, I may be subject to sanctions by the Court.

Signed:  15th  day of <u>July</u>, 2018.

Plaintiff's Signature: _____

Plaintiff's Printed Name: <u>Curtis K. Jackson Sr.</u>

Plaintiff's Mailing Address: <u>1751DWest Howard Street, Chicago, Illinois 60626</u>

17